UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| 803 CAPITOL STREET, VALLEJO CALIFORNIA 94590, | ) Civil No. 06-1710 (RMC) |
| | ) |
| 1441 VAQUERO GLEN, ESCONDIDO CALIFORNIA 92026, | ) |
| | ) |
| APPROXIMATELY $276,645.97 IN FUNDS FROM CHARLES SCHWAB INVESTMENT ACCOUNTS 6884-3181, 6884-3186 AND 6884-3192, AND $135,442.60 IN STOCKS MAINTAINED BY CHARLES SCHWAB, ALL HELD IN THE NAME OF DEBORAH J. PALFREY, | ) |
| | ) |
| $11,396.35 IN FUNDS FROM WELLS FARGO ACCOUNTS 6952-139217 AND 005-9211417, HELD IN THE NAME OF DEBORAH J. PALFREY, | ) |
| | ) |
| AND | ) |
| | ) |
| 413 GOLD KRUGERRANDS AND OTHER GOLD AND SILVER COINS, | ) |
| | ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT FOR FORFEITURE *IN REM***

    The United States of America, by and through the United States Attorney for the District of Columbia, respectfully states as follows:

    1. This is a civil forfeiture action, *in rem*, brought to enforce 18 U.S.C. § 981(a)(1)(A), which authorizes the forfeiture of any real or personal property that is involved in a money

laundering offense (18 U.S.C. §§ 1956 or 1957).  This action is also brought to enforce 18 U.S.C. § 981(a)(1)(C), which authorizes the forfeiture of any property that constitutes or is derived from proceeds traceable to, among other offenses, any offense, or conspiracy to commit such offense, that is a "specified unlawful activity" of the federal anti-money laundering statutes.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355(a).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1355(b)(1)(A) and 1395(a).

4. The defendant real properties, with all appurtenances and improvements thereon, are: (a) 803 Capitol Street, Vallejo, California 94590 ("Capitol Street"); and (b) 1441 Vaquero Glen, Escondido, California 92026 ("Vaquero Glen"), and are more fully described as:

### 803 Capitol Street

> The North Seventy (70) Feet of Lot Nine (9) in block three Hundred and Six (306), as the same is shown on the official map of the City of Vallejo, made by E.H. Rowe, C.S., and which map was filed for record in the Office of the County Recorder of Solano County, California, September 19, 1868, in Book 1 of Maps, Page 123.

### 1441 Vaquero Glen

> Lot 17 of Escondido Tract No. 350 in the City of Escondido, County of San Diego, State of California according to map thereof No. 9034, filed in the Office of the County Recorder of San Diego County on November 22, 1978.

5. The defendant personal properties consist of a total amount of $276,645.97 in funds from Charles Schwab investment accounts 6884-3181, 6884-3186, and 6884-3192, and approximately $135,442.60 in stocks maintained in these accounts by Charles Schwab, a total amount of $11,396.35 from Wells Fargo accounts 6952-139217 and 005-9211417, (hereafter collectively "the Accounts"), and 413 Gold Krugerrands and other gold and silver coins

(hereafter collectively "Coins"). The Accounts are each held in the name of Deborah J. Palfrey (hereafter "Palfrey"). The Coins were seized from Palfrey's residence. The funds and stocks were seized/frozen pursuant to seizure warrants issued by a United States Magistrate Judge for the District of Columbia and are more fully described as:

> Charles Schwab Account 6884-3181 (funds $36,458.67);
> Charles Schwab Account 6884-3186 (funds $188,403.71; stock approximately $125,432.60);
> Charles Schwab Account 6884-3192 (funds $51,783.59; stock approximately $10,010.00);
> Wells Fargo Account 6952-139217 (funds $2,055.68); and
> Wells Fargo Account 005-9211417 (funds $9,340.67).

The Coins were seized from 803 Capitol Street, Vallejo, California, pursuant to a search and seizure warrant issued by a United States Magistrate Judge for the Eastern District of California, and are more fully described as:

> 413 South African Gold Krugerrands;
> 81 U.S. Liberty $50 Gold Coins;
> 320 U.S. Liberty $1 Silver Coins; and
> 61 Canadian $50 Gold Coins.

6. Palfrey is the titled owner of the defendant real properties at Capitol Street and Vaquero Glen. The funds from the Accounts are being held in the U.S. Customs Suspense Account. The stocks in the Accounts have been frozen by this Court's legal process and are being maintained by Charles Schwab. The Coins are currently located at the U.S. Postal Inspection Service Office in Merrifield, Virginia.

7. In accordance with 18 U.S.C. § 985(b)(1)(A), the defendant real properties will not be seized until the entry of orders of forfeiture.

**BASES FOR FORFEITURE**

8. The defendant properties (the above-identified real properties and personal properties) are subject to forfeiture because, as set forth below, they: (1) constitute proceeds or are derived from proceeds traceable to violations of 18 U.S.C. § 1952 (Interstate Travel or Transportation in Aid of Racketeering Enterprises), a "specified unlawful activity" (as referenced in 18 U.S.C. § 981(c) and defined in 18 U.S.C. § 1956(c)(7)(A) (incorporating § 1961(1)); and/or (2) constitute property involved in money laundering, in violation of 18 U.S.C. § 1956; and/or (3) constitute proceeds or property involved in conspiracies to commit these offenses, in violation of 18 U.S.C. §§ 371 and 1956(h).

**FACTS**

9. In about June 2004, investigators with the Internal Revenue Service and the United States Postal Service began a joint investigation of a business enterprise involving illegal prostitution (hereafter "prostitution business"), that Deborah J. Palfrey operated in Washington, D.C., Maryland, Virginia, and California. The investigators learned through the review of financial documents and other sources, including from interviews of some of Palfrey's male customers and interviews of some of the females who had worked for Palfrey as prostitutes, that Palfrey operated a prostitution business, identified by her as "Pamela Martin and Associates", from in or about 1993 and continuing until the conspiracy ceased, in or about August 2006. Investigation has revealed that, during this time, cash proceeds derived from Palfrey's participation in a conspiracy to operate an illegal prostitution business were obtained and laundered -- converted into checks and mailed to California -- and, thereafter, further laundered into the defendant properties at issue here.

10. Investigation reveals that from about 1993 until in or about August 2006, Palfrey, in conjunction with and in conspiracy with others, in the District of Columbia and elsewhere, operated a prostitution business under the name Pamela Martin and Associates, that she identified as a full-service escort service, and by which she induced females to act as prostitutes, and arranged for prostitutes to perform sexual intercourse and other sex acts with men, in Washington D.C. and its surrounding areas, for money.

11. The interstate prostitution business that Palfrey operated violated federal law and District of Columbia laws, including 18 U.S.C. §§ 1952 (Racketeering) and 371 (Conspiracy), and D.C. Code §§ 22-2705 (Pandering; Inducing or Compelling an Individual to Engage in Prostitution), and 22-2707 (Procuring; Receiving money or Other Valuable Thing for Arranging Assignation) and 1805(a) (Conspiracy). Commission of the conduct proscribed by these statutes constitutes a felony.

12. As part of the prostitution business that Palfrey operated in the District of Columbia and surroundings, Palfrey induced, enticed, and procured individuals to engage in prostitution, and she received money or other valuable things for or on account of arranging for or causing female prostitutes to have sexual intercourse with males and/or engage in prostitution, debauchery, or other immoral acts, in violation of D.C. Code, §§ 22-2705 and/or 22-2707.

13. As part of her prostitution business and as part of the conspiracies, within the District of Columbia and elsewhere, Palfrey caused: (1) female prostitutes to engage in illegal prostitution, including arranging for female prostitutes to provide sexual intercourse and oral sex to male customers for a fee ("prostitution services"); (2) part of the fees collected by the female prostitutes to be converted from cash to money orders; (3) money orders constituting Palfrey's

share of the cash fees to be mailed to Palfrey's post office box in California; (4) telephone calls to be made to California from Washington, D.C., by male customers seeking prostitution services; and (5) photographs and applications to be mailed by female prostitutes to California from Washington, D.C., and elsewhere.

14. Under District of Columbia law, "'[p]rostitution' means engaging, agreeing to engage, or offering to engage in sexual acts or contacts with another person in return for a fee," and "'[a]rranging for prostitution' means any act to procure or attempt to procure or otherwise arrange for the purpose of prostitution, regardless of whether such procurement or arrangement occurred or a fee was paid." *See* D.C. Code, § 22-2701.01.

15. In 1991, Palfrey was convicted for operating an illegal prostitution business in California. She served 18 months in prison for this offense.

16. After her release from prison, Palfrey started operating another prostitution business that she identified as a full-service or adult-service escort agency named "Pamela Martin and Associates," in about 1993. Palfrey resided in California, and conducted certain business operations there, including certain record keeping, but Pamela Martin and Associates is not incorporated in California. From 1993 until 2006, prostitutes hired by Palfrey and working for Pamela Martin and Associates engaged in sex acts for paying customers of the so-called escort service in hotels, residences, and offices located in Virginia, Maryland, and the District of Columbia.

17. Although Palfrey operated Pamela Martin and Associates, she sought anonymity. When conducting her business's operations, she identified herself to customers and employees as "Julia" or "Miz Julia."

18. Palfrey advertised Pamela Martin and Associates, her business, as an escort service in the yellow pages, on the Internet, and in the Washington City Paper.

19. Palfrey recruited female prostitutes through advertisements on the Internet, in the Washington City Paper, and in the University of Maryland student newspaper. Palfrey's website was www.pamelamartin.com.

20. Palfrey required that the female prostitutes she hired be at least twenty-two years of age and have some college education.

21. Palfrey's website listed three telephone numbers. The male customers, who wanted to obtain prostitution services, called the telephone numbers. Female prostitutes, who wanted to apply for jobs with Pamela Martin and Associates, also used these telephone numbers. These telephone numbers had the area codes of 202, 301, and 410. The 202 area code is a Washington, D.C., area code. Generally, Palfrey directed that these local calls would be forwarded to Palfrey's home phone, in California. On some occasions when Palfrey knew she would be unavailable, she also hired others to answer telephone calls.

22. Palfrey interviewed female prostitutes who were applying for jobs, by telephone. She required that the female prostitutes mail an application and a photograph to Palfrey's post office box in Benicia, California.

23. Once hired, Palfrey sent each female prostitute to a "screening" appointment during which each new hire was required to engage in sexual intercourse, for no pay, with a man known by Palfrey not to be a police officer. Palfrey conducted screenings to ensure that the female prostitutes were not themselves law enforcement officers and to ensure that the women understood that Pamela Martin and Associates's full service escorts were expected to perform

sex acts with the fee-paying male customers. Palfrey used several males for the screening appointments. These screeners did pay for the prostitution services Palfrey arranged, sometimes sending payments directly to Palfrey in the form of checks written on the screeners' checking accounts.

24. Earlier this year, a search warrant was executed at Palfrey's residence at 803 Capitol Street, Vallejo, California. Palfrey kept detailed books of information concerning the female prostitutes, including their photographs and dates of employment, as well as ledgers showing the amounts the female prostitutes made and Palfrey's share of the fees collected by the female prostitutes. At the same time, however, Palfrey instructed women working for Pamela Martin and Associates not to keep such records. To avoid detection by law enforcement officials of the extent of the prostitution engaged in by Palfrey's prostitutes in the Washington, D.C. and Baltimore metropolitan areas, Palfrey told her employees that "all information regarding a client/appointment is to be destroyed (burned, shredded) within 24 hours."

25. The female prostitutes established their own work schedules, but Palfrey encouraged them to work at least three nights each week.

26. Palfrey provided the female prostitutes with the names of the male customers, and the locations and times for the prostitutes to perform prostitution services for customers of Pamela Martin and Associates at hotels, offices and private residences in Washington, D.C., Maryland, and Virginia..

27. During the course of her operation of Pamela Martin and Associates, Palfrey distributed "Newsletters" to the prostitutes she employed, by which Palfrey provided advice on how she intended her prostitution business to be conducted, how she wanted her employees to

conduct themselves and manage their activities and time so that the business would prosper, and on how the so-called escorts she hired and directed might avoid detection by law enforcement authorities. The information in these newsletters advises prostitutes to be circumspect in their discussions with customers, and when communicating with Julia (Palfrey), as part of Palfrey's effort to avoid detection and to profess ignorance should detection occur. In a "Week ending May 29, 1994" newsletter, Palfrey explained that "these newsletters are pumped-out . . . <u>for the sole purpose of assisting and helping the escort staff, with just about every imaginable subject</u>[.]"

28. For example, Palfrey instructed her employees to keep the newsletters for future reference, but, in a "July thru September, 2000" newsletter, she also told the prostitutes that "[n]o record is a good record!!! Therefore, all information regarding a client/appointment is to be destroyed (burned, shredded), within 4 hours."

29. In an "April thru June, 1995" newsletter, Palfrey instructed:

> One never quite knows where evil, i.e., the vice squad, is lurking in this business. INTENSE SCRUTINY OF ANY DWELLING SPACE (HOME, OFFICE OR HOTEL), VISITED BY PAMELA MARTIN, IS ABSOLUTELY NECESSARY WHEN ON-CALL! ... The misogynists get a real kick out of surprising (shocking) you girls, whenever <u>you give them the opportunity!!!</u> Often, this is simply done. The motherfuckers bust through an "unbolted" (left unbolted by you) door, with video cameras in-hand, while you, the escort, are in various stages of undress. . . . Therefore, you are to lock, double lock, triple lock all doors!!! . . . Figure it out, before they "get cha"!!! KEEP THIS AND ALL NEWSLETTERS/GUIDELINES ON-FILE FOR REFERENCE.

30. In a "Week ending June 26, 1994" newsletter that Palfrey sent to her prostitutes (republishing part of a 1993 newsletter), Palfrey wrote: "Recently, the cops obtained the names and addresses of various PM clientele, from an escort busted during the Alexandria sting

9

operation . . . the bimbo kept records (apparently)!" Palfrey also explained that "the escort would [not] have reason to contact the client once a call has been completed, consequently, there should be no recordation of the appointment." Palfrey also indicated that some of the money she collected "is going for (among other things) legal fees for everyone!!!"

31. In an "October thru December, 1996" newsletter that Palfrey sent to her prostitutes, Palfrey wrote: "No legal unpleasantries occurred during the course of the entire year and none realistically, are expected anytime in the near future. Again, the only jurisdiction, which Mgt. firmly believes gives a "*flying fig*" in this regard, is that charming city of Alexandria, VA. Needless to say, we continue to not service this area."

32. In a "July thru September, 1997" newsletter that Palfrey sent to her prostitutes, Palfrey wrote that Pamela Martin and Associates begins its 5th Year of operation on October 15th." In an "April thru June, 1998" "Newsletter" that Palfrey sent to her prostitutes, Palfrey explained that "Pamela Martin operates for only 6 hours approximately, each night, from 5/6 pm to 11 pm/12 am."

33. In a "Week ending May 22, 1994" newsletter, Palfrey explained to her employees the difference between "social escorts" and "adult service" escorts. Palfrey wrote:

> Social escorts . . . . ...are booked out at approximately $40-50 an hour, usually for functions, banquets, parties and so forth. Conversely, adult service or fantasy escorts command a substantially greater fee, usually $200 an hour; this, of course, because of the risky and sexual nature of these appointments (much like a waitress at a coffee shop vs. a waitress or dancer in a topless show bar. ) Obviously, the more liberal the booking or act, the more $ one makes. Therefore, if (any)one thinks that fantasy prices can ever be changed for *purely social services* (as a new hire recently believed)...all this writer can say, is that the person (s) is a ***damned fool!*** This past weekend (Memorial weekend), this new

escort (no longer amongst us) thought she could go "there", collect the $200 and "*just talk*"...*her mere presence being justification enough here for the big bucks!!!* W R O N G!!!

At its most basic, this type of activity is what is referred to as *theft by deception,* in legal circles. Hey folks, *NOW THIS IS A CRIMINAL ACT!!!!!!!!!!!!!!!!!!!........ This is a scam...This is just plain stealing!* Quite honestly, the wrong guy in the wrong mood at the wrong time, will bash and bloody this little girl's face to the point that it will be made unrecognizable someday, if she continues to pursue her dishonest ways. **People, in this or "any" circumstance do not like to be tricked and cheated!!!**

This paragraph is being written, not for *Pamela Martin's* current staff, but for the benefit of its future personnel. One should never think, *not even for a second,* that such deception will go unnoticed or unreported to the Agency. This gal's first client (a regular) *just couldn't wait* to call the dispatcher and express his anger at being ripped-off. The second client was a "set-up", to prove or disprove the first client's allegations. *We do not sell social appointments, but adult fantasy ones here at Pamela Martin.* Anyone, who believes otherwise, will find themselves(like this girl found herself) immediately unemployed.

34. In a "Weeking [sic] ending October 30, 1994" newsletter, Palfrey wrote:

> MAJOR CLARIFICATION[:] 90 minute appointments vs. 60 minute ones were originally created for a variety of reasons including the fact that we, here at *Pamela Martin*, try "very hard" to do things a step or two above that of our competitors. We want the client to always enjoy his appointment and to never feel rushed! Often, an hour is not quite enough time, but an hour and a half is for completing enjoyment. Nonetheless, in the course of implementing this 90 minute policy, Mgt. has discovered that certain clients and even certain escorts for that matter, tend to interpret this 90 minute time frame "rather literally". It needs to be clarified once and for all, that the client is paying for the "activity" conducted within the one and one half hour period, not for the 90 minutes itself!!! This means once the performance or routine is concluded you, the escort, are permitted to leave (gracefully, of course). 45 minutes to an hour and 15 minutes is sufficient, here. If the performance takes the entire time or if you wish to stay the full amount of time ... this is fine, but there should be no feeling of

obligation on your part to do so! If there is a problem, refer the client to Julia. Again, 45 minutes to an hour and 15 minutes is reasonable. Let's not see any 20 to 30 minute stuff, OK?

35. In a "Week ending September 25, 1994" newsletter, Palfrey wrote:

THE ONLY THING WHICH NEEDS TO BE SAID[:]  '___, would you mind taking care of the monetary aspect before I check-in with the Agency?' This is the <u>only</u> statement or quasi-unilateral discussion you, the escort, have and/or ever will have with a client. This is all that needs to be said ... <u>this is all that you will say!!!</u>

36. In a January thru March, 1998 newsletter Palfrey wrote:

I've been in this business for a long time and have busted my fuck-head clients trying to video tape our little rendevous!! . . . Sometimes they won't try it the first time you're together . . . they think about their little mental movie . . . then they go buy the camera . . . and then you think they are nice and you can trust them . . . then you're in the video stores!!!

37. In a "Week ending December 19, 1993" newsletter Palfrey wrote:

Mgt. can't adequately emphasize its absolute intolerance for careless, "who gives a fuck" attitudes, by either escorts or dispatchers. Such mindsets/behavior would <u>never</u> be tolerated in any quote, unquote "straight job" and they <u>will</u> <u>not</u> be tolerated as well, at PM. We advertise quality service to our clientele and by god, they will receive such, via each and every representative of this agency. Minimum wage mentalities can go elsewhere for employment.

38. In a "Week ending May 15, 1994" newsletter Palfrey wrote:

PARTICIPATION[:]  Those "*Bad Boys*" are at it, again! This time (ironically), in the town the Constitutional Framers called home...the City of Alexandria. Detective [REDACTED], Vice/Narcotics, City of Alexandria, Badge [...] was/is running a *sting operation,* his annual spring clean-up, out of the Oakwood Apartments, 125 So. Reynolds . . . . [The Detective's] gig or MO is to lie in a prone position, butt-assed naked, penis pointing due north, with arms and hands rigidly at his sides, while the escort performs *"his"* fantasy of choice. With [Detective] doing nothing

and the girl everything, it's easy (easier....much easier) to make a case of wrongdoing against the gal. *Anything,* and this writer means a-n-y-t-h-i-n-g, the escort does during the booking, can and will subsequently, be construed as *criminal, corrupt, wrong, illegitimate, incorrect, bad, criminal, unlawful* (you get the picture), by those fine and unbiased law enforcement officers hiding in the walk-in closet. Pick your nose, scratch your head or even cough, while being set-up and you (the escort) will discover (much to your surprise- *make that shock*), that you have broken the law and are probably under arrest. Nothing all of a sudden will automatically be turned into everything and you will be screwed!!! Therefore, in order to prevent such nasty scenarios from occurring, it would be wise to see to it that the [Detectives] of this world do a little more than just "*lie there*", during the appointments. *MAKE HIM PARTICIPATE!!!* This way, if he scratches his head, while you scratch your head, then maybe (just maybe) scratching one's head won't be interpreted as a 1st class felony, punishable by death or life imprisonment. *We're not doing anything wrong, but they'll sure as heck try to make anything we do into something wrong!!! Remember this!*

39. In a "Week ending February 6, 1994" newsletter Palfrey wrote:

MONTHLY ILLNESS[:] Each month, during that time, if you, the escort, are not up to going out on an appointment, but prefer to stay at home on the sofa, with a hot water bottle, *please* simply call in sick. Do not go into unnecessary detail about heavy flow cycles and related areas, when explaining your inability to work. Such things are not relevant to your position, nor the duties/services you perform as an escort. Albeit inadvertent, an impression of *illegality* could easily be derived here, from such remarks by an outside third party. We, in the escort/fantasy business, exist in a grayer state of being than other so-called legitimate enterprises. Therefore, we have to be more careful about *everything* we do and say, including conversations about such ordinary subjects as monthly periods. We cannot, even for a moment, relay a feeling of any sort of illegality, about this or any other topic! It may seem silly at times to behave in such a paranoid fashion, however, it is a must for survival.

40. The male customers paid various fees ranging from $250 to approximately $300 for prostitution services. The male customers paid the female prostitutes with checks and with cash.

41. Palfrey knew that the adult service escorts working for Pamela Martin and Associates performed sex acts, including oral sex, and sexual intercourse, with Pamela Martin and Associates customers. Palfrey refused to hire, and generally would fire, escorts who refused to engage in prostitution activity. Palfrey did permit an employee who refused to have sex with a customer to remain employed after the prostitute explained to Palfrey that the customer's penis appeared to be diseased.

42. Palfrey instructed the female prostitutes employed by Pamela Martin and Associates to keep a percentage of the cash fee obtained from male customers and to forward the remaining amounts of money to Palfrey's post office box in Benicia, California. Checks from male customers were sent directly to Palfrey, and, in return, the female prostitutes were allowed to keep larger portions of cash fees obtained from subsequent male customers.

43. Palfrey instructed the female prostitutes to convert Palfrey's portion of cash fees to postal or other types of money orders and mail them to Palfrey's post office box in Benicia, California. Postal records and bank records confirm Palfrey's prostitutes purchased approximately $200,000 worth of money orders in Washington, D.C., and mailed them to Palfrey, in California, up through August, 2006. Such records also indicate that approximately one million dollars in postal money orders were sent by prostitutes to Palfrey during Palfrey's operation of Pamela Martin and Associates. Checks from male customers were also mailed from Washington, D.C. to Palfrey's post office box in California.

44. Palfrey maintained the Accounts in her name, not in the name of Pamela Martin and Associates. However, Palfrey used the name of Pamela Martin and Associates on some financial documents, including purported withholding statements that she mailed to some of the female

prostitutes she employed.

45. Until the funds in the Accounts were seized, Palfrey deposited the money orders mailed to her by the female prostitutes into the Accounts and transferred funds among the Accounts.

46. Palfrey paid her personal living expenses, including mortgage payments and car lease payments, from the Accounts into which proceeds from Palfrey's prostitution business had been deposited and/or transferred.

47. Palfrey paid mortgage payments and other expenses for the defendant real properties from the Accounts into which proceeds from Palfrey's prostitution business were deposited and/or transferred.

48. From the Accounts into which proceeds from her prostitution business were deposited, Palfrey made payments for renovations made to the defendant Capitol Street property.

49. From in or about 1996 through in or about 1999, Palfrey used money orders to purchase some of the defendant Coins from Mr. G's Coins in Vallejo, California.

50. Palfrey has had neither any other apparent employment, nor any apparent legitimate source of income, during the time (from in or about 1993 through in or about August 2006) that she was operating her prostitution business as Pamela Martin and Associates, paying the mortgages and for the improvements on the defendant real properties, purchasing the defendant Coins, or making deposits into and transferring monies among the Accounts.

<u>Defendant Capitol Street Real Property</u>

51. On July 9, 1991, a deed was recorded in Solano County, California reflecting the conveyance of the defendant Capitol Street property to Palfrey.

52. In August 1991, Palfrey conveyed the defendant Capitol Street property to a Blanche E. Palfrey and Frank Palfrey, husband and wife, but in August 1999, the defendant Capitol Street property was reconveyed to Palfrey.

53. In January 2002, Palfrey obtained a loan and a Deed of Trust was filed on the Capitol Street property. In June 2006, Palfrey paid off this outstanding loan and the Deed of Trust on the Capitol Street property was released.

54. In July 2006, the defendant Capitol Street property was valued at approximately $495,000.

Defendant Vaquero Glen Real Property

55. On May 1, 2000, a deed was recorded in the official records of the San Diego County, California Recorder's Office reflecting the conveyance of the defendant Vaquero Glen property to Palfrey.

56. There may be outstanding Deeds of Trust on the defendant Vaquero Glen property. One appears to have been filed on April 17, 2000, in the amount of $160,000 and the other on January 8, 2002, in the amount of $40,000.

57. In July 2006, the defendant Vaquero Glen property was valued at approximately $480,000.

## COUNT I

58. All statements and averments made in paragraphs 1- 57 are re-alleged and incorporated, herein, by reference.

59. The defendant properties are subject to forfeiture because they constitutes or are derived from proceeds traceable to the interstate travel or transportation in aid of racketeering

enterprises, in violation of 18 U.S.C. § 1952, a "specified unlawful activity."

60. As such, the defendant Capitol Street property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT II

61. All statements and averments made in paragraphs 1- 57 are re-alleged and incorporated, herein, by reference.

62. The defendant properties are subject to forfeiture because they constitutes or are derived from proceeds traceable to a conspiracy to violate 18 U.S.C. § 1952, in violation of 18 U.S.C. § 371.

63. As such, the defendant Capitol Street property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT III

64. All statements and averments made in paragraphs 1- 57 are re-alleged and incorporated, herein, by reference.

65. The defendant properties are subject to forfeiture because they were involved or are traceable to property involved in a "financial transaction" as that term is defined by 18 U.S.C. § 1956(c)(4), the purpose of which was to: (a) promote the carrying on of the interstate travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952), a "specified unlawful activity," as that term is defined by 18 U.S.C. § 1956(c)(4); and/or (b) conceal or disguise the nature, location, source, ownership or control of the proceeds of the interstate travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952), a "specified unlawful activity" as that term is defined by 18 U.S.C. § 1956(c)(7).

66. As such, the defendant properties were involved in or are traceable to property involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and/or 1956(a)(1)(B)(i) and are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### COUNT IV

67. All statements and averments made in paragraphs 1- 57 are re-alleged and incorporated, herein, by reference.

68. The defendant properties are subject to forfeiture because they were involved in or are traceable to property involved in a conspiracy to violate the anti-money laundering statutes (as more particularly described in Count III), in violation of 18 U.S.C. § 1956(h).

69. As such, the defendant properties are, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the defendant properties as described above; that due notice be given to all parties to appear and show cause why the forfeitures should not be decreed; that judgments be entered declaring that the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

                Respectfully submitted,

                _/s/_____
                JEFFREY A. TAYLOR
                United States Attorney
                D.C. Bar No. 498610

    /s/_____
WILLIAM R. COWDEN
Assistant United States Attorney
D.C. Bar No. 426301

## VERIFICATION

I, Troy A. Burrus, a Special Agent with the Internal Revenue Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing First Amended Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by law enforcement agents and that everything represented herein is true and correct to the best of my knowledge and belief.

Executed on this 22nd day of November, 2006.

    /s/_____
Troy A. Burrus
Special Agent
Internal Revenue Service